UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CHARLES EDWARD LUCKETT,

Petitioner,

v.

G. MATTESON, Acting Warden,[1]

Respondent.

Case No. 18-cv-07670-HSG (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY**

Before the Court is the *pro se* petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 by Petitioner Charles Edward Luckett challenging the validity of a judgment obtained against him in state court. Respondent has filed an answer to the petition, Dkt. No. 10, and Petitioner has filed a traverse, Dkt. No. 12. For the reasons set forth below, the petition is denied.

I.   **PROCEDURAL HISTORY**

   A.   **Conviction and Sentencing**

Following a match of his DNA and a "cold case" investigation by the Oakland Police Department, Petitioner was charged on March 22, 2013 for the 1993 murder of the manager of a local Sizzler restaurant. *People v. Luckett*, No. A145856, 2017 WL 1315669, *1 (Cal. Ct. App. Apr. 10, 2017). The information alleged that the murder occurred during an attempted robbery in July 1993, and that Petitioner used a firearm in the commission of the offense. *Id.*

---

[1] Petitioner informed the Court in March 2020 that he had been transferred from California State Prison - Solano to Santa Rita Jail for "the purposes of resentencing" scheduled on May 28, 2020. *See* Dkt. 13. Petitioner has not communicated with the Court since he sent that letter on March 9, 2020, which was during the start of the COVID-19 pandemic. As Petitioner is likely to return to the same prison to serve any remaining prison time after his resentencing, the Court substitutes G. Matteson, the current acting warden of the prison where Petitioner was previously incarcerated, as Respondent pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

United States District Court
Northern District of California

The jury found Petitioner guilty of first degree murder with the special circumstance that it occurred during an attempted robbery, and the trial court sentenced him to a term of life without parole, plus an additional five-year term for the firearm enhancement.  *Id.* at *3.

**B.      Post-Conviction Appeals and Collateral Attacks**

Petitioner filed a timely appeal in the California Court of Appeal.  *Id.*  His primary argument on direct appeal was that the trial court erred in denying his motion to dismiss, or in the alternative exclude key DNA evidence, based on the police department's loss of additional, untested physical evidence collected at the crime scene and the lengthy pre-accusation delay.  *Id.* at *1.  (Petitioner raises a portion of this evidentiary claim, i.e., that the trial court admitted unreliable DNA evidence over the defense motion to include it, as Claim 4 in the present petition.) Petitioner also claimed that the trial court erred in excluding third-party culpability evidence and deprived him of his right to present a defense.  *Id.* at *6-7.  (He raised this issue as Claim 5 in the present petition.)  The state appellate court found no basis for reversal on these or any of the additional arguments presented on appeal.  *Id.* at *3-12.  Thus, on April 10, 2017, in an unpublished opinion, the state appellate court affirmed the judgment on direct appeal and remanded for modification of the abstract of judgment.[2]  *Id.* at *12.

On July 12, 2017, the California Supreme Court denied review.  Answer, Ex. H.

On January 8, 2018, the United States Supreme Court denied certiorari.  *Luckett v. California*, 138 S. Ct. 665 (2018).

Although Petitioner asserts that he did not seek collateral relief in the state courts, *see* Dkt. No. 1 at 3, on December 13, 2017, he filed a state habeas petition in the Alameda County Superior Court, *see* Answer, Ex. I.  Petitioner raised the following claims (none of which have been raised in the present petition): he was improperly convicted of first degree murder as an aider and abettor under a natural and probable consequences theory; he should not have been convicted of special circumstances murder under a felony-murder theory; and appellate counsel was ineffective.  *See*

---

[2] On March 9, 2020, Petitioner informed the Court that he had been transferred to Santa Rita Jail in order to attend his resentencing hearing at the Alameda County Superior Court.  *See* Dkt. No. 13.

*id.* He also raised two other alleged instructional errors (also not included in the present petition). *See id.*

On December 27, 2017, the state superior court denied the petition.  Answer, Ex. J.

Petitioner apparently did not pursue this denial in a higher court.  Instead, he filed a second state habeas petition in the state superior court.  Answer, Ex. K.  Petitioner raised the following five claims: (1) the prosecution "presented false evidence concerning the timestamps on a video"; (2) the prosecution "withheld this exculpatory evidence"; (3) there was an "improper chain of custody for the DNA sample taken from the scene"; (4) the trial court "erred in denying Petitioner's motion to dismiss or, in the alternative, to exclude DNA evidence"; and (5) the trial court "improperly excluded evidence that Petitioner had a look alike brother who was detained in around the time of the crime." *Id.*

On April 17, 2018, the state superior court denied the petition for procedural reasons.  *See id.*  The court denied the petition as: (1) untimely; (2) successive; (3) specifically as to Claim 4 as "raised and rejected on appeal,"; (4) specifically as to Claims 1, 3 and 5 as claims that "Petitioner should have, but did not, raise on appeal." *Id.*  The court also stated that if the claims were not procedurally barred, they would be denied for failure to state a prima facie case for relief.  *See id.*

Petitioner filed a state habeas petition in the California Court of Appeal.  Answer, Ex. L. The state appellate court issued a silent denial.  *See id.*

Petitioner then filed a state habeas petition in the California Supreme Court.  Answer, Ex. M.  The state supreme court also issued a silent denial of the petition.  Answer, Ex. N.

**C.     Federal Court Proceedings**

On December 21, 2018, Petitioner filed the present petition.  Dkt. No. 1.  Petitioner claims: (1) the prosecution "presented false evidence concerning a remade beginning of a video"; (2) the prosecution "withheld this exculpatory evidence"; (3) there was an "improper chain of custody for the DNA sample taken from [the] scene"; (4) the trial court "erred in denying the motion to dismiss, or to exclude DNA evidence"; (5) the trial court "improperly excluded evidence that it was [his] brother detained in [the] police perimeter minutes after, also excluded was [testimony from the] officer that detained him"; and (6) "destruction of evidence in police custody after

3

request for testing." *Id.* at 7.

On January 31, 2019, Magistrate Judge Jacqueline Scott Corley issued an Order to Show Cause. Dkt. No. 6. Magistrate Judge Corley construed the claims to be as follows: (1) the prosecution presented false evidence; (2) the prosecution withheld exculpatory evidence; (3) the trial court admitted unreliable DNA evidence over the defense motion to exclude it;[3] (4) the trial court excluded exculpatory evidence concerning Petitioner's brother; and (5) the police destroyed evidence after Petitioner requested that it be tested for DNA evidence. *Id.* at 2. Respondent filed an answer on April 30, 2019. Dkt. No. 10. Petitioner filed a traverse on May 30, 2019. Dkt. No. 12.

## II.    STATEMENT OF FACTS

The following factual background is taken from the April 10, 2017 opinion of the California Court of Appeal:[4]

The following evidence was presented at trial:

Carson Smith was working as a waiter at a Sizzler restaurant the night of July 16, 1993. He testified that two African-American men came into the restaurant and ordered hamburgers with french fries. Because the restaurant had run out of french fries, he served them a baked potato instead. After the men had been there for about an hour and a half, one of the men complained that there was a hair in the hamburger dressing and demanded to see the manager. When the manager came to the table, one of the men called to Smith. As he approached, the man lifted his shirt and displayed a gun. Smith ran from the restaurant and called 911.

Rodney Williams, who was eating at the restaurant, heard the men demanding to speak to the manager. Shortly after the manager went to their table, the men stood up and one yelled, "This is a robbery. . . . Everybody get down." The other man was walking with his arm around the manager's neck toward the front of restaurant. One of the men said, "Open the safe, open the safe." The other man said, "Hurry it up" and then "Okay, well, just bust him." Williams then heard three gun shots. Other customers in the restaurant provided testimony that was essentially consistent with Williams's testimony, the primary discrepancy being that one customer testified he thought two other men might also have been involved.

---

[3] As explained above, this claim is presented in two claims (Claims 3 and 4) in the petition. Dkt. No. 1 at 7.

[4] The Court has independently reviewed the record as required by AEDPA. *Nasby v. McDaniel*, 853 F.3d 1049, 1055 (9th Cir. 2017). Based on its independent review, the Court finds that it can reasonably conclude that the state appellate court's summary of facts is supported by the record and that this summary is therefore entitled to a presumption of correctness, *Taylor v. Maddox*, 366 F.3d 992, 999-1000 (9th Cir. 2004), *abrogated on other grounds*, *Murray v. Schriro*, 745 F.3d 984, 1000 (9th Cir. 2014), unless otherwise indicated in this order.

United States District Court
Northern District of California

Police were dispatched to the restaurant around 10:48 p.m.  Upon their arrival, they found customers under tables in the dining area and the manager lying face down on the floor in front of the safe.  The manager was unresponsive with three apparent bullet wounds to his back and leg.

The suspects were described in the police report.  One suspect was described as a Black male, "30's to 40's, five-seven, 170, sideburns and full beard, nappy hair, fluffy, light blue jacket, light blue jeans."  The other suspect was described as a Black male "late 30's to early 40's five-nine to six feet, 170 pounds, dark complexion, light mustache, wearing a hat, sunglasses and a zippered jacket unknown colors, and armed with a nine-millimeter .45-caliber chromed gun."

Shortly after arriving, the police set up a perimeter to detain anyone who matched the description of the suspects.  The police took Smith to a location where he identified a man as having been involved in the crime.[FN 2]  Other witnesses were brought to various locations where suspects had been detained but they could not identify any of them as having been involved in the crime.  Customers who testified at trial confirmed that they were brought to various locations to see if they could identify anyone, but they were unable to do so.

> [FN 2]:  That man, Harvey Brumfield, was arrested and charged with the murder but the case was later dismissed based on a lack of evidence.  Prior to trial in the present case, the prosecution's motion to exclude reference to the prosecutorial proceedings against Brumfield was granted.  As set forth above, the jury was allowed to hear that a man other than defendant was stopped near the scene and identified by Smith.

During the course of the investigation, a police inspector instructed an evidence technician to collect all the objects on the table at which the men sat.  Among other things, the technician collected a cigarette butt from inside a piece of aluminum foil which contained part of a baked potato and three additional cigarette butts from a small dish.

In 2012, the Oakland Police Department reopened the investigation into the murder.[FN 3]  The police sent a photo array to Florida, where Smith was then living.  Smith was shown the six photos furnished by Oakland police and identified a photo of defendant as "maybe" having been the other man involved in the murder.  At trial, Smith identified defendant as one of the two men involved in the robbery.  An additional employee and other customers who testified at trial could not identify defendant.

> [FN 3]:  Although not before the jury, the record shows that the police requested DNA testing of the cigarette butts in October 2001 but that the testing was not completed and entered into CODIS (Combined DNA Index System) until December 23, 2005.  In November 2007, the Department of Justice gave written notice to the Oakland Police Department that the sample from the cigarette butt found with the baked potato matched defendant's DNA.  Based on this notice, the Oakland Police Department reopened its investigation into the homicide.

In the course of the investigation, defendant was interviewed and police obtained a new sample of his DNA.  Portions of defendant's interview with the police were played for the jury.  In the interview, defendant told the officers that he was "kind of homeless" and worked odd jobs.  He admitted that he used to drink an "awful lot" and had been convicted a few times of driving under the influence.  He used to smoke cigarettes but stopped because they are too expensive.  He grew up in Oakland, but moved to Compton in 1976.  He had been "back and forth" between the two cities since the 1990s.  He had three brothers, Joseph, Cris, Larry, but Joe and Cris had passed away.  He said that none of them were twins, but "[w]e all look alike."

When the police informed him that the interview was about a shooting that occurred in 1993, he said he believed he was in Long Beach or Compton working security at the time. He explained that he moved to Compton to be with his wife shortly after being released from jail for driving under the influence in 1992. He did not think he came back to Oakland from 1993 until after 2000, although he recalled coming to Oakland for his brother's funeral at some point. Defendant could not recall hearing about a 1993 robbery at the Sizzler where "the manager ended up getting shot." He claimed to have never witnessed a shooting in his life and thought he would probably remember hearing about a murder.

A forensic analyst from the Oakland Police Department crime laboratory testified that in 2004 she conducted DNA analysis on a cigarette butt recovered from the foil wrapped potato found on the table where the suspects had been seated. In her opinion, the DNA she found on the butt came from a single source. She compared the 2004 profile to defendant's 2012 profile and concluded that defendant could not be excluded as the source of the DNA. In her opinion, the chance that someone other than defendant would have contributed to the DNA she found on the cigarette butt would be one in 9.7 trillion unrelated persons in the general population of Caucasians, African-Americans or Southwest Hispanics. The three other cigarette butts that had been taken into evidence at the scene were missing and had not been processed.

Defendant testified at trial. Consistent with his police interview, he testified that he was living and working in Long Beach at the time of the shooting. He denied being in Oakland on July 16, 1993, and testified that he had not been there since August 1991 after being released from jail. The next time he was in Oakland was on December 10, 1995, for his brother's funeral. He testified that he had never shot anyone or was with anyone who did. He claimed that at the time, he did not smoke and he had no idea how his DNA got on the cigarette butt. Sometimes, however, he would put a cigarette in his mouth. He explained that "sitting around drinking, I used—I chew on them, put them in my mouth or something, but I didn't smoke, especially not then" because his wife did not like him to smoke.

Defendant's forensic expert also analyzed the cigarette butt found at the restaurant and agreed that defendant could be a contributor. Unlike the Oakland Police Department, however, his results indicated "that the DNA on the cigarette paper is a mixture from at least two people," not just one contributor.

Defendant's brother Larry testified that he recalled defendant being in a local jail for a while in 1991, then leaving Oakland for Southern California where their sister Joyce lived. Defendant lived in Compton or Long Beach with his wife and children. He did not see defendant between 1991 and their brother's funeral in 1995 or 1996. Defendant's sister Joyce testified that defendant was living in Los Angeles in 1993. She remembered that he would stay with her at times when he was separated from his wife. She testified that he did security work and, at times, managed or maintained apartment buildings. She did not recall July 16, 1993 specifically, but testified that she usually celebrated the Fourth of July holiday with defendant and his children and, to the best of her knowledge, they did this in 1993 and defendant was there.

*Luckett*, 2017 WL 1315669, *1-3 (footnotes in original and brackets added).

## III.   DISCUSSION

### A.   Standard of Review

A petition for a writ of habeas corpus is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). This Court may entertain a petition for a writ of habeas corpus

1   "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that

2   he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C.

3   § 2254(a).

4           A district court may not grant a petition challenging a state conviction or sentence on the

5   basis of a claim that was reviewed on the merits in state court unless the state courts adjudication

6   of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable

7   application of, clearly established Federal law, as determined by the Supreme Court of the United

8   States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in

9   light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *Williams v.*

10  *Taylor*, 529 U.S. 362, 412-13 (2000).  Additionally, habeas relief is warranted only if the

11  constitutional error at issue "'had substantial and injurious effect or influence in determining the

12  jury's verdict.'"  *Penry v. Johnson*, 532 U.S. 782, 795 (2001) (quoting *Brecht v. Abrahamson*, 507

13  U.S. 619, 637 (1993)).

14          A state court decision is "contrary to" clearly established Supreme Court precedent if it

15  "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it

16  "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme]

17  Court and nevertheless arrives at a result different from [its] precedent."  *Williams*, 529 U.S. at

18  405-06.  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if

19  the state court identifies the correct governing legal principle from [the Supreme] Court's

20  decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.

21  "[A] federal habeas court may not issue the writ simply because that court concludes in its

22  independent judgment that the relevant state-court decision applied clearly established federal law

23  erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 411.

24          Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's

25  jurisprudence.  "[C]learly established Federal law, as determined by the Supreme Court of the

26  United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions

27  as of the time of the relevant state-court decision."  *Williams*, 529 U.S. at 412.  "A federal court

28  may not overrule a state court for simply holding a view different from its own, when the

1    precedent from [the Supreme Court] is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17

2    (2003).

3           Here, as noted above, the California Supreme Court summarily denied Petitioner's petition

4    for review.  *See* Answer, Ex. H.  As mentioned above, the California Court of Appeal, in its

5    opinion on direct review, addressed two claims in the instant petition: Claims 4 and 5.  The state

6    appellate court thus was the highest court to have reviewed those claims in a reasoned decision,

7    and, as to those claims, it is the state appellate court's decision that this Court reviews herein.  *See*

8    *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091-92

9    (9th Cir. 2005).

10          Petitioner raised Claims 1-3 for the first time in his second state habeas petition filed with

11   the state superior court, which concluded that the petition was untimely, that it was successive,

12   and that Petitioner could have raised any issues related to the redaction on direct appeal.  *See*

13   Answer, Ex. K.  The state superior court stated that if the claims were not procedurally barred,

14   they would be denied for failure to state a prima facie case for relief.  *See id.*  The state appellate

15   and supreme courts issued silent denials of the state habeas petitions filed in the respective courts.

16   Answer, Exs. L and N.  This Court looks through the silent denials by the state appellate and

17   supreme courts to the last reasoned decision of the state courts.  *See Ylst*, 501 U.S. at 801-06.

18   Accordingly, it is the state superior court's decision which is subject to review with respect to

19   Claims 1-3.

20          The Supreme Court has vigorously and repeatedly affirmed that under AEDPA, there is a

21   heightened level of deference a federal habeas court must give to state court decisions.  *See Hardy*

22   *v. Cross*, 132 S. Ct. 490, 491 (2011) (per curiam); *Harrington v. Richter*, 562 U.S. 86, 97-100

23   (2011); *Felkner v. Jackson*, 131 S. Ct. 1305 (2011) (per curiam).  As the Court explained: "[o]n

24   federal habeas review, AEDPA 'imposes a highly deferential standard for evaluating state-court

25   rulings' and 'demands that state-court decisions be given the benefit of the doubt.'"  *Id.* at 1307

26   (citation omitted).  With these principles in mind regarding the standard and limited scope of

27   review in which this Court may engage in federal habeas proceedings, the Court addresses

28   Petitioner's claims.

United States District Court
Northern District of California

8

B.      **Petitioner's Claims**

Petitioner raises the following six claims: (1) the prosecution "presented false evidence concerning a remade beginning of a video"; (2) the prosecution "withheld this exculpatory [video] evidence"; (3) there was an "improper chain of custody for the DNA sample taken from [the] scene"; (4) the trial court "erred in denying the motion to dismiss, or to exclude DNA evidence"; (5) the trial court "improperly excluded evidence that it was [Petitioner's] brother detained in [the] police perimeter minutes after, also excluded was [testimony from the] officer that detained [Petitioner's brother]"; and (6) the improper "destruction of evidence in police custody after request for testing." Dkt. No. 1 at 7 (brackets added).

1.      **Claims Relating to Prosecution Presenting False Evidence and Withholding Exculpatory Evidence (Claims 1 and 2)**

Respondent argues that Claims 1 and 2 are procedurally defaulted and therefore must be dismissed. Dkt. No. 10-1 at 12-16.

The first two claims Magistrate Judge Corley found cognizable are that the prosecution presented false evidence and withheld exculpatory evidence. Dkt. No. 1 at 7. Respondent points out that these two claims are "actually different ways of viewing the same substantive claim, i.e. that the prosecution allegedly presented false evidence 'concerning a remade beginning of a video.'" Dkt. No. 10-1 at 6 (citing Dkt. No. 1 at 7). The Court agrees. Specifically, Petitioner's first two claims involving alleged false evidence seem to be related to the beginning of his recorded video interview with the police on May 23, 2012, which was redacted with the agreement of defense counsel, and the redacted version was played to the jury. Dkt. No. 1 at 7; Supp. CT[5] 20. In that interview Petitioner not only denied involvement in the murder, but also denied that he was in Oakland during the year of the murder. Supp. CT 30, 35. What is significant about the video from the prosecution's standpoint is that Petitioner stated that he did not know anything about a murder even though the police had not mentioned that they were investigating a homicide. Supp. CT 49. Petitioner argues that in addition to the redaction of the parts to which defense

---

[5] Respondent refers to the Supplemental Clerk's Transcript as the "ACT," but the Court will refer to it as the "Supp. CT" in this Order. The redacted and unredacted versions have been lodged by Respondent as Exhibit A. *See* Dkt. No. 10-8.

United States District Court
Northern District of California

counsel agreed, the prosecutor also redacted the beginning of the interview in which the officers allegedly stated that they were investigating a homicide. Dkt. No. 1 at 7. However, Respondent points out that "[o]ther than what might be inferred from his testimony, [P]etitioner did not proffer any evidence to the trial court or to the California Supreme Court in his state petition for habeas corpus to support a claim that if any portion of the tape was missing, it showed that the police had stated that they were investigating a homicide." Dkt. No. 10-1 at 6 fn. 1.

### a.    Factual Background

On Wednesday, March 18, 2015, before the evidentiary portion of the trial, the trial court reviewed a video of Petitioner's May 23, 2012 recorded statement to the police, and the following exchange took place between the trial court and the prosecutor, Danielle Hilton, Esq.:

> THE COURT:  Okay.  All right.  And then I'll finish up—in looking at the video of Mr. Luckett, there's the first initial interview and then there's a break, and the transcript I think, the first transcript on the first section tracks it pretty well.  The transcript on the second one, I think you might check this, right in the beginning misses some stuff.
>
> MS. HILTON [the prosecutor]:  I apologize.  What the Court has is a rough draft of the transcript because I was trying to get something to the Court.  I apologize.  I know the tape is complete.  I apologize if the accompanying transcript is not.
>
> THE COURT:  You might check just the—there's that first initial interview and then there's a break and when they start the second one.  I'll look at that too.  I'll finish that up probably today.

1RT 97.[6]  The prosecutor then agreed to redact portions of the video regarding collateral matters that reflected unfavorably on Petitioner as well as information about his brother.  1RT 101-102. During the afternoon session on the same date, the prosecutor stated that she and defense counsel, Theodore Berry, Esq., had agreed as to what was to be redacted from the transcript.  1RT 110. The parties discussed these redactions with the trial court, and they agreed on which redactions would be implemented before trial.  1RT 110-113.

The record contains two transcripts of the interview, i.e., the redacted and unredacted versions.  Supp. CT 20-81, Supp. CT 83-131.  The unredacted transcript includes a more complete version of the interview.  Supp. CT 20-81.  Meanwhile, the redacted transcript excludes any

---

[6] Volume 1 of the Reporter's Transcript ("1RT") has been lodged by Respondent as Exhibit B. *See* Dkt. No. 10-9.

references to Petitioner's brother.  Supp. CT 83-131.  Thus, the Court will cite to the unredacted transcript.

The unredacted transcript begins with one of the officers (who conducted the questioning) identifying himself, and with Petitioner saying that he was "curious as to what is this."  Supp. CT 20.  After obtaining background information from Petitioner one of the officers stated that they were investigating "a shooting" that had occurred at a Sizzler restaurant in the 1990's, and that the manager had been shot.  Supp. CT 35.  Petitioner stated that he could not remember being at a Sizzler.  Supp. CT 35.  The officers told Petitioner that his brother had been stopped afterwards.  Supp. CT 35-37.  Petitioner stated that he was in Los Angeles at the time.  Supp. CT 43.  In response to a question about whether he would remember a "huge scene" at the Sizzler restaurant, Petitioner said, "I don't remember anybody getting killed."  Supp. CT 48-49.  After responding to that question, Petitioner added, "I would remember hearing about a murder."  Supp. CT 49.

At trial, the prosecution presented evidence that the police had not mentioned anything about a homicide before Petitioner mentioned it.  2RT 397[7]; 3RT 632[8].  Petitioner testified that the officers had told him at the beginning of the interview that they were investigating a homicide.  3RT 550-551.  Defense counsel argued that the tape had been truncated, and that it was possible that at the beginning the police had mentioned that they were investigating a homicide.  3RT 655.

### b.    Procedural Default Principles

Federal habeas relief is barred on grounds of procedural default if a state denied claims because a petitioner failed to comply with the state's requirements for presenting them.  *Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991).  The state's grounds for denying the claim must be "independent of the federal question and adequate to support the judgment."  *Id.* at 729.  A state procedural bar is "adequate" if it is "clear, consistently applied, and well-established at the time of the petitioner's purported default."  *Calderon v. U.S. Dist. Ct. (Bean)*, 96 F.3d 1126, 1129 (9th

---

[7] Volume 2 of the Reporter's Transcript ("2RT") has been lodged by Respondent as Exhibit B.  *See* Dkt. No. 10-10.

[8] Volume 3 of the Reporter's Transcript ("3RT") has been lodged by Respondent as Exhibit B.  *See* Dkt. No. 10-11.

United States District Court
Northern District of California

Cir. 1996) (quoting *Wells v. Maass*, 28 F.3d 1005, 1010 (9th Cir. 1994)).

The state carries the initial burden of adequately pleading "the existence of an independent and adequate state procedural ground as an affirmative defense." *Bennett v. Mueller*, 322 F.3d 573, 586 (9th Cir. 2003). If the state meets this requirement, the burden then shifts to the petitioner "to place that defense in issue," which the petitioner may do "by asserting specific factual allegations that demonstrate the inadequacy of the state procedure, including citation to authority demonstrating inconsistent application of the rule." *Id.*

When the Ninth Circuit has determined that a rule is adequate, the petitioner then must cite cases "demonstrating subsequent inconsistent application" to meet his burden under *Bennett*. *King v. LaMarque*, 464 F.3d 963, 967 (9th Cir. 2006). If the petitioner meets this burden, "the ultimate burden" of proving the adequacy of the state bar rests with the state, which must demonstrate "that the state procedural rule has been regularly and consistently applied in habeas actions." *Bennett*, 322 F.3d at 586.

To overcome a claim of procedural default, petitioner must establish either (1) cause for the default, and prejudice, or (2) that failure to consider the defaulted claims will result in a "fundamental miscarriage of justice." *Harris v. Reed*, 489 U.S. 255, 262 (1989). To show cause for a procedural default, the petitioner must "show that some objective factor external to the defense impeded" his efforts to comply with the state procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). For cause to exist, the external impediment must have prevented the petitioner from raising the claim. *See McCleskey v. Zant*, 499 U.S. 467, 497 (1991). To show prejudice, a petitioner bears "the burden of showing not merely that the errors [complained of] constituted a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire [proceeding] with errors of constitutional dimension." *White v. Lewis*, 874 F.2d 599, 603 (9th Cir. 1989) (citing *United States v. Frady*, 456 U.S. 152, 170 (1982)). If the petitioner fails to show cause, the court need not consider whether the petitioner suffered actual prejudice. *Engle v. Isaac*, 456 U.S. 107, 134 n.43 (1982).

To show a fundamental "miscarriage of justice," a petitioner must show that the constitutional error of which he complains "has probably resulted in the conviction of one who is

12

actually innocent." *Bousley v. United States*, 523 U.S. 614, 623 (1998) (citing *Murray*, 477 U.S. at 496).  "Actual innocence" is established when, in light of all the evidence, "it is more likely than not that no reasonable juror would have convicted [the petitioner]." *Id.* at 623 (quoting *Schlup v. Delo*, 513 U.S. 298, 327-28 (1995)).  "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Id.*  A petitioner can make a showing of "actual innocence" by presenting the court with new evidence that raises a sufficient doubt as "to undermine confidence in the result of the trial." *Schlup*, 513 U.S. at 324.

### c.     Analysis

As mentioned, Respondent asserts that Claims 1 and 2 are procedurally defaulted.  Dkt. No. 10-1 at 14-16.  Respondent points out that Claims 1 and 2 are "essentially different ways of formulating the same argument, i.e., that the prosecutor redacted a greater portion of the video than the redactions on which the parties agreed."  Dkt. No. 10-1 at 14.  The Court notes that these claims were not raised on direct appeal.  *See* Answer, Ex. G.  Nor did Petitioner raise either claim when he filed his first state habeas petition.  *See* Answer, Ex. I.  Petitioner first raised Claims 1 and 2 in his second state habeas petition filed in the state superior court.  *See* Answer, Ex. K.  The state superior court concluded that the petition was untimely, was successive, and that Petitioner could have raised any issues related to the redaction on direct appeal.  *See id.*  The state superior court stated that if the claims were not procedurally barred, they would be denied for failure to state a prima facie case for relief.  *See id.*  The state appellate and supreme courts issued silent denials of the state habeas petitions filed in the respective courts.  Answer, Exs. L and N.

The Court finds that Respondent has carried the initial burden of adequately pleading the existence of an independent and adequate state procedural ground as an affirmative defense.  As Respondent points out, the state superior court denied the second state habeas petition: (1) as untimely with citations *to In re Sanders*, 21 Cal. 4th 697, 703 (1999); *In re Robbins*, 18 Cal. 4th 770, 780 (1998); *In re Clark*, 5 Cal. 4th 750, 767-68, 775 (1993); *In re Nunez*, 173 Cal. App. 4th 709, 724 (Cal. Ct. App. 2009); and *In re Sodersten*, 146 Cal. App. 4th 1163, 1221 (Cal. Ct. App. 2007); (2) as successive with a citation to *In re Reno*, 55 Cal. 4th 428, 496-97, 501-05 (2012); and *In re Clark*, 5 Cal. 4th at 767-69, 774-75, 797; and (3) because Claims 1, 3 and 5 in the second

United States District Court
Northern District of California

1   state habeas petition were not raised on direct appeal, as required by California law, with citations

2   to *In re Harris*, 5 Cal. 4th 813, 829 (1993) and *In re Dixon*, 41 Cal. 2d 756, 759 (1953).  *See* Dkt.

3   No. 10-1 at 14-15 (citing Answer, Ex, K).  Because the state appellate and supreme courts denied

4   Petitioner's state habeas petitions without comment, it is presumed that these courts did not

5   disregard the aforementioned procedural bar and consider the merits.  *See Ylst*, 501 U.S. at 801-06.

6          As to the petition being untimely, the United States Supreme Court has held that

7   California's timeliness rule, as announced in *In re Clark* and *In re Robbins*, which were among the

8   cases the state superior court cited in its denial of the second state habeas petition, is an adequate

9   and independent state ground for the denial of federal habeas corpus relief.  *Walker v. Martin*, 562

10  U.S. 307, 310, 312, 316-21 (2011).

11         Next, having identified the *In re Clark* rule against successive petitions as another

12  procedural bar imposed on the state habeas petition by the state superior court, *see* Answer, Ex. K

13  (citing *In re Clark*, 5 Cal. 4th at 767-69, 774-75, 797 (absent justification for a failure to present

14  all known claims in a single, timely habeas petition, a successive petition will be denied)), this

15  Court next must consider whether that bar is independent and adequate, so as to preclude federal

16  habeas review, *see Coleman*, 501 U.S. at 729.  Although the Ninth Circuit has not ruled on

17  whether California's bar on successive petitions constitutes valid grounds for procedural default of

18  federal claims, several district courts (including courts in this district) have concluded in well-

19  reasoned decisions that it does.  *See e.g.*, *Briggs v. State*, No. 15-cv-05809-EMC, 2017 WL

20  1806495, *6-7 (N.D. Cal. 2017) (concluding that California's successiveness bar is adequate and

21  independent); *Flowers v. Foulk*, 2016 WL 4611554, *4 (N.D. Cal. 2016) (same); *Ray v. Cate*, No.

22  C 11-1604 YGR (PR), 2014 WL 3841214, *15 (N.D. Cal. 2014) (same) ; *Rutledge v. Katavich*,

23  2012 WL 2054975, at *6-7 (N.D.  Cal. 2012) (same); (N.D. Cal. 2012); *Arroyo v. Curry*, No. C

24  07-03718 SBA (PR), 2009 WL 723877, *3-6 (N.D. Cal. 2009) (same).  This Court adopts the

25  reasoning of these decisions and finds that *In re Clark* constitutes an independent and adequate

26  state procedural ground for the state court's denial of Petitioner's claims, barring federal habeas

27  review.

28         The Supreme Court also has held that California's rule barring claims that could have been

United States District Court
Northern District of California

14

1    raised on direct appeal, as announced in *In re Dixon*, which was also cited in the state superior

2    court's denial as to Claim 1, is an adequate and independent state ground for the denial of habeas

3    relief.  *See Johnson v. Lee*, 136 S. Ct. 1802, 1806 (2016) (per curiam).

4        Petitioner, has not met his burden "to place th[ose] defense[s] in issue."  *Bennett*, 322 F.3d

5    at 586.  He has not asserted any "specific factual allegations that demonstrate the inadequacy of

6    the state procedure."  *Id.*  Therefore, Claims 1 and 2 are procedurally defaulted.

7        Procedural default, however, can be overcome if a petitioner "can demonstrate cause for

8    the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate

9    that failure to consider the claims will result in a fundamental miscarriage of justice."  *Coleman*,

10   501 U.S. at 750.  The "cause standard" requires the petitioner to show that "'some objective factor

11   external to the defense impeded counsel's efforts' to raise the claim."  *McCleskey v. Zant*, 499

12   U.S. 467, 493 (1991) (quoting *Murray*, 477 U.S. at 488).  "Without attempting an exhaustive

13   catalog of such objective impediments to compliance with a procedural rule," the Supreme Court

14   has noted that "a showing that the factual or legal basis for a claim was not reasonably available to

15   counsel, or that some interference by officials made compliance impracticable, would constitute

16   cause under this standard."  *Murray*, 477 U.S. at 488 (internal quotation and citations omitted).  As

17   to the prejudice prong, Petitioner bears the burden of showing "not merely that the errors at his

18   trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial

19   disadvantage, infecting his entire trial with error of constitutional dimensions."  *United States v.*

20   *Frady*, 456 U.S. 152, 170 (1982).  "To ascertain the level to which such errors taint the

21   constitutional sufficiency of the trial, they must 'be evaluated in the total context of the events at

22   trial.'"  *See Paradis v. Arave*, 130 F.3d 385, 393 (9th Cir. 1997) (quoting *Frady*, 456 U.S. at 169).

23       Here, Petitioner is unable to meet his burden of showing cause.  Nor is there anything in

24   the record to suggest he could make the requisite showing.  His explanation for the default does

25   not constitute cause under the law.  Petitioner claims he "did not receive the transcripts until

26   months after the appeal decision was final."  Dkt. No. 12 at 3.  In essence, Petitioner seems to be

27   arguing that he did not know the factual basis for Claims 1 and 2 until he received the transcripts

28   of the May 23, 2012 police interview and "could not act upon it until [he] received the

United States District Court
Northern District of California

United States District Court
Northern District of California

1  transcript . . . ." *Id.*  However, this argument is unavailing.  The factual basis for his claim is not

2  taken from the transcripts that he received years later; instead the factual basis for his claim is that

3  the redacted transcript of the interview presented to the jury was incomplete.  Petitioner was aware

4  of this fact *during* the trial because he was present at the interview, and he should have raised any

5  challenge to the redacted transcript on direct appeal.  Because there is no "objective factor external

6  to the defense" that impeded Petitioner's ability to comply with the state rule against either

7  untimely or successive petitions, this Court cannot find that Petitioner has shown cause for the

8  default.  *See Murray*, 477 U.S. at 488.

9      Nor does Petitioner satisfy the second possible exception to procedural default, namely,

10  that the Court's failure to consider the claims will result in a fundamental miscarriage of justice.

11  The "miscarriage of justice" exception is limited to habeas petitioners who can show, based on

12  "new reliable evidence," that "'a constitutional violation has probably resulted in the conviction of

13  one who is actually innocent.'"  *Schlup v. Delo*, 513 U.S. 298, 324-27 (1995) (quoting *Murray*,

14  477 U.S. at 496); *see, e.g.*, *Wildman v. Johnson*, 261 F.3d 832, 842-43 (9th Cir. 2001) (holding

15  petitioner must establish "factual innocence" in order to show fundamental miscarriage of justice

16  would result from application of procedural default).

17      Here, Petitioner submits no "new reliable evidence" establishing *factual innocence*.

18  Instead, in his traverse, Petitioner claims in a conclusory fashion that "[a]nother situation in which

19  a federal court may also address a procedurally defaulted claim is where failure to do so would

20  result in the conviction of one who is actually innocent."  Dkt. No. 12 at 4.  Petitioner's argument

21  is that "no reasonable jurors would have convicted [him] in light of the new evidence (the redacted

22  beginning [of the video])."  *Id.*  As explained above, Petitioner claims that when he was

23  interviewed, he "did in fact get an introduction from one or both officers saying they were from

24  homicide as [Petitioner] testified, and they simply chose to eliminate that from the video."  *Id.* at

25  6.  Respondent points out that "[t]he jury heard conflicting evidence as to whether the officers had

26  told [Petitioner] they were investigating a homicide at the very beginning of the interview."  Dkt.

27  No. 10-1 at 16.

28      "To be credible, such [an actual innocence] claim requires petitioner to support his

16

allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324.  The "new" evidence need not be newly available, just newly presented—that is, evidence that was not presented at trial.  *Griffin v. Johnson*, 350 F.3d 956, 961 (9th Cir. 2003).

It is not enough that the new evidence shows the existence of reasonable doubt; rather, petitioner must show "that it is more likely than not that no 'reasonable juror' would have convicted him." *Schlup*, 513 U.S. at 329.  As the Ninth Circuit has stated, "the test is whether, with the new evidence, it is more likely than not that no reasonable juror would have found [the] [p]etitioner guilty." *Van Buskirk v. Baldwin*, 265 F.3d 1080, 1084 (9th Cir. 2001).  Thus, actual innocence means factual innocence, not merely legal insufficiency. *Bousley v. United States*, 523 U.S. 614, 623-24 (1998) (citing *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992)).

In the present case, Petitioner alleges that he is actually innocent of the 1993 murder. Petitioner suggests that due to misconduct on the part of police and the prosecution, his trial was corrupted and he was falsely convicted.  Dkt. No. 12 at 3-9.  Specifically, Petitioner argues as follows:

> [T]his conviction is based on false and tampered with evidence, I know the case and I know the facts, I was not there.  The conviction is based on this false evidence, if you present false evidence, logic say[s] you have withheld the truth—[l]et the record speak, "It's conclusive, they have simply chosen to eliminate the beginning introduction."

*Id.* at 9.

Petitioner's claims fail because his allegations relating to the "new evidence (the redacted beginning [of the interview]" does not amount to "clear and convincing evidence" that he is actually innocent of the 1993 murder.  Petitioner confuses the actual innocence standard with an inquiry into the merits of his case.  He has provided no evidence akin to "credible declarations of guilt by another, trustworthy eyewitness accounts, or exculpatory scientific evidence" to support his innocence. *Schlup*, 513 U.S. at 324.  Instead, Petitioner alleges that misconduct at trial caused him to be prejudiced during legal proceedings.  Such misconduct has no bearing upon whether he

1    is actually innocent of the 1993 murder of which he was convicted.  As such, the Court is not

2    persuaded that no reasonable juror would have found Petitioner guilty beyond a reasonable doubt

3    had the jury been presented with this new evidence.  *See Griffin*, 350 F.3d at 961.

4    Based on the foregoing, the Court finds that Claims 1 and 2 are procedurally defaulted.

5    Because Petitioner has failed to demonstrate cause for the default and actual prejudice as a result

6    of the alleged violation of federal law, or demonstrate that failure to consider the claims will result

7    in a fundamental miscarriage of justice, federal habeas relief is barred on grounds of procedural

8    default.  *Coleman*, 501 U.S. at 750.  Accordingly, because Claims 1 and 2 are procedurally barred,

9    habeas relief on these claims is denied.

10                    **2.    Claims Relating to DNA Evidence (Claims 3, 4 and 6)**

11    Petitioner next claims that there was an "improper chain of custody for the DNA sample

12    taken from [the] scene" (Claim 3) and that the trial court "erred in denying the motion to dismiss,

13    or to exclude DNA evidence" (Claim 4).  Dkt. No. 1 at 7.  He also claims that certain DNA

14    evidence was improperly destroyed after he was charged with the murder (Claim 6).  *Id.*

15    Respondent points out that Magistrate Judge Corley's January 31, 2019 Order to Show

16    Cause "combined Petitioner's third and fourth claims into one claim, i.e. that the trial court

17    admitted unreliable DNA evidence over the defense motion to exclude it."  Dkt. No. 10-1 at 17;

18    *see* Dkt. No. 6 at 2 fn. 2.  Respondent further points out as follows: "While Petitioner's third and

19    fourth claims are not entirely clear, they actually appear to be two separate claims, neither of

20    which actually goes to the reliability of the DNA evidence."  Dkt. No. 10-1 at 17.  The Court

21    agrees that the claims are separate.  It will analyze Claims 3 and 4 separately below, and it will

22    also resolve a portion of Claim 6 to the extent that it is related to these other claims involving

23    DNA evidence.

24                    **a.    Improper Chain of Custody for DNA Sample (Claim 3) –
                                    Procedural Default**

25    Claim 3 appears to relate to two different aspects of the chain of custody of the cigarette

26    butt that the prosecution said was recovered from the foil wrapped potato found on the table where

27    the suspects had been seated, and that contained the DNA sample.  Dkt. No. 1 at 5; Dkt. No. 1-1 at

28

United States District Court
Northern District of California

7.[9]  One aspect of the claim is that the officer who collected the cigarette butt failed to document in his report the location from which he collected it, i.e., whether it was from a plate on the suspects' table.  Dkt. No. 1-1 at 7.  The other aspect of the chain of custody claim is that the lab records do not adequately show that the butt had been destroyed.  *Id.* at 9.

Petitioner did not raise any issue pertaining to the chain of custody on direct appeal.  *See* Answer, Ex. G.  However, Petitioner raised Claim 3 relating to an "improper chain of custody for the DNA sample taken from the scene" in his second state habeas petition.  Answer, Ex. K.  As mentioned, in ruling on that petition, the state superior court found that Claim 3 was untimely and successive (for the same reasons as Claims 1 and 2 discussed above), and that Claim 3 could have been raised on appeal because it was based on matters within the record.  *Id.*  As the Court found above, these constitute valid procedural bars.  *See supra* Part.III.B.1.c.  As with Claims 1 and 2, this Court looks through the silent denials by the state appellate and supreme courts to the last reasoned decision of the state courts.  *See* Ylst, 501 U.S. at 801-06.   Again, for the same reasons stated above, this Court finds that the state superior court denied Petitioner's claim based on adequate and independent state grounds.  *See supra* Part.III.B.1.c.

Petitioner has not established cause (that some objective factor external to the defense prevented him from raising Claim 3).  Because he has not shown cause, the Court need not determine whether he suffered prejudice.  *Isaac*, 456 U.S. at 134 n.43.

For the same reasons outlined above, Petitioner also has not shown that a failure to consider the merits of Claim 3 will result in a miscarriage of justice.  In sum, there is no claim or showing that the constitutional error of which he complains in Claim 3 "has probably resulted in the conviction of one who is actually innocent."  *Bousley*, 523 U.S. at 623 (citing *Murray*, 477 U.S. at 496).   Therefore, Petitioner's Claim 3 is procedurally barred.

### b. Improper Chain of Custody for DNA Sample (Claim 3) and Improper Destruction of Evidence in Police Custody (Claim 6)

Even if Petitioner could overcome the procedural bar as to his improper chain of custody

_____

[9] Petitioner's attachment to his petition, which is entitled "Necessity for Review," contains the arguments linked to his federal claims.  *See* Dkt. No. 1-1.

United States District Court
Northern District of California

1    claim (Claim 3), he has not shown that such a claim raises an issue that is cognizable on federal

2    habeas review, i.e., a federal constitutional issue.  In this section, the Court will also resolve a

3    related claim involving the improper destruction of the three other cigarette butts in police custody

4    after he was named a suspect in 2012 (Claim 6).

### 1)  Claim 3

6         As to Claim 3, Petitioner alleges that the cigarette butts that had been in the possession of

7    the police, including the subsequently destroyed three cigarette butts, had not been kept in a proper

8    "chain of custody" and thus violated his right to due process.  However, Respondent argues that a

9    "chain of custody claim is not cognizable in a federal habeas action because it presents a matter of

10   state law."  Dkt. No. 10-1 at 17-18.  The Court agrees, as explained below.

11        "Simple errors of state law do not warrant federal habeas relief."  *Holley v. Yarborough*,

12   568 F.3d 1091, 1101 (9th Cir. 2009).  "[F]ailure to comply with the state's rules of evidence is

13   neither a necessary nor a sufficient basis for granting habeas relief."  *Jammal v. Van de Kamp*, 926

14   F.2d 918, 920 (9th Cir. 1991).  The improper admission of evidence will only provide a basis for

15   habeas relief if "'it rendered the trial fundamentally unfair in violation of due process.'"  *Holley*,

16   568 F.3d at 1101.  "Only if there are no permissible inferences the jury may draw from the

17   evidence can its admission violate due process."  *Jammal*, 926 F.2d at 920 (emphasis omitted).

18        Petitioner's contention that the admission of the DNA evidence from the cigarette

19   butt violated his due process rights does not entitle him to habeas relief because there are no

20   controlling Supreme Court decisions holding that the admission of evidence based on an

21   inadequate chain of custody violates due process.  *Holley*, 568 F.3d at 1101 ("The Supreme Court

22   . . . has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence

23   constitutes a due process violation sufficient to warrant issuance of the writ.").  As such, there is

24   no clearly established Supreme Court law directly addressing this issue, and therefore the state

25   court's decision on this issue cannot be contrary to, or an unreasonable application of, federal law.

26   *See Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008).

### 2)  Claim 6

28        As a related claim, in Claim 6, Petitioner seems to argue that the prosecution violated

United States District Court
Northern District of California

*Brady v. Maryland*, 373 U.S. 83 (1963), by failing to turn over evidence regarding the other three cigarette butts collected from the area where the murder suspects were seated because they were improperly destroyed after he was charged with the murder. *See* Dkt. No. 1 at 5, 6; Dkt. No. 1-1 at 2, 7. In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *See* 373 U.S. at 87. For a *Brady* claim to succeed, a petitioner must show: (1) that the evidence at issue is favorable to the accused, either because it is exculpatory or impeaching; (2) that it was suppressed by the prosecution, either willfully or inadvertently; and (3) that it was material (or, put differently, that prejudice ensued). *Banks v. Dretke*, 540 U.S. 668, 691 (2004).

However, because none of the three cigarette butts at issue were ever tested for DNA because they had destroyed, Petitioner cannot demonstrate that such evidence was either favorable to him, or that it was material. *See id.* Therefore, his *Brady* issue linked to Claim 6 fails.

### 3)  Summary

Accordingly, even if Claim 3 is not procedurally defaulted, the Court finds that it does not present a basis for federal habeas relief. In addition, to the extent that Claim 6 raises a *Brady* issue, it has no merit because Petitioner cannot demonstrate that the evidence at issue—i.e., the three cigarette butts that were destroyed—was favorable to him or material to guilt. *See Banks*, 540 U.S. at 691.

### c.      Improper Admission of DNA Evidence (Claim 4)

Petitioner's Claim 4 is that the DNA evidence should have been excluded as a sanction for the loss of the cigarette butt evidence. Dkt. No. 1 at 7. Petitioner raised this claim as a federal issue on direct appeal, and the state appellate court addressed it on the merits.

### 1)  State Court Opinion

The state appellate court described the factual background for this claim, then set forth the applicable state and federal law, and rejected it as follows:

> Defendant claims that the police department's loss of the additional three cigarette butts collected at the scene violated his right to due process under the federal and state Constitutions. "The relevant due process principles have been discussed many times before.

[Citations.]   Law enforcement agencies must preserve evidence only if it possesses exculpatory value 'apparent before [it] was destroyed,' and not obtainable 'by other reasonably available means.' [Citations.]  The state's responsibility is further limited when the defendant challenges the failure to preserve evidence 'of which no more can be said than that it could have been subjected to tests' that might have helped the defense.  [Citation.]  In such a case, unless the defendant can show 'bad faith' by the police, failure to preserve 'potentially useful evidence' does not violate his due process rights."  (*People v. DePriest* (2007) 42 Cal. 4th 1, 41-42.)

Prior to trial, defendant moved to dismiss the information, exclude the DNA evidence or, alternatively, give appropriate limiting instructions based on the loss of the three cigarette butts.  At a hearing on the motion, a supervisor from the police department's evidence unit testified that the envelope that was supposed to contain the cigarette butts was not in the storage container in which it was deposited.  Instead, there was a post-it note where the evidence should have been that was dated October 2001 and written in the handwriting of a now retired supervisor.  The note stated that she was unable to locate the envelope, and that she presumed it had been destroyed by another employee on January 1, 2001.  The witness made an "educated guess" based on the post-it note and other records that the cigarette butts had been destroyed when an employee either mistook the case number for that of another case with a similar number, or took the wrong envelope from the evidence locker.  She could not be sure, however, that the evidence was destroyed because there were 59 freezers containing evidence and no one had looked in all of freezers for the missing envelope.  The trial court denied defendant's motion on the basis that the cigarette butts had no apparent exculpatory value at the time they were destroyed and there had been no showing of bad faith by the police department.

Defendant contends that contrary to the trial court's conclusion, the "material exculpatory significance" of the missing cigarette butts was apparent before their testing.  He argues, "Unless one person smoked all four different butts (some unfiltered and found in different makeshift 'ashtrays'), it should have been apparent that *all* the butts were exculpatory (based on DNA or indeed blood type inclusion or exclusion).  Unless the waiter's dubious (and disputed) claim only two people ever sat at that table (or that more than one might have smoked) is the last word, forensic confirmation of *anyone* besides one identified robber at that table was critical to identify (*and* exclude) the second robber in a forensics case like this.  Even before the advent of routine DNA testing, the butts were kept if only to exclude or include blood types; by 2001, the DNA-significance of these items to confirm multiple smokers was even stronger and more apparent.  Unless it is assumed one person smoked the disparate butts, any confirmation of a second (or third, etc.) smoker was significant to rebut claims this was just one smoker or just two people eating and acting alone in tandem the entire night; this, in turn, served to exculpate any supposed second robber."

Because defendant denied being present in the Oakland restaurant at the time of the crime, the significance of another person's DNA on the missing cigarette butts is highly doubtful.  Moreover, defendant's argument makes clear that at the time the cigarette butts were destroyed, any exculpatory value was merely a potential, subject to confirmation by testing.  Accordingly, this evidence falls squarely within the rule requiring bad faith before a violation of defendant's due process rights can be found.

Defendant contends the record does not support the trial court's finding that there was no bad faith.  (*People v. Alvarez* (2014) 229 Cal. App. 4th 761, 776 ["We review the trial court's finding on the existence or nonexistence of bad faith under the substantial evidence standard."].)  Defendant argues, "Active animus or not, destruction of this single set of items (but not others including the lone remaining butt) from a cold-case based on (suspected) transposing of case numbers is inexcusable, past the point of mere negligence or gross recklessness."  We disagree.  Nothing in the record suggests the [sic] that the police knew or even could have suspected at the time the cigarettes were lost or destroyed that testing

might have exculpated defendant.  Substantial evidence undoubtedly supports the trial court's finding that the destruction of the evidence was entirely accidental.

Finally, defendant suggests that the police department's failure to collect several additional items (plates, water glasses, silverware) also violated his dues [sic] process rights.  The police did, however, collect some additional items and these items were tested but disclosed no fingerprints.  Again, given the lack of apparent exculpatory value, defendant was required to but cannot show bad faith by the police.

*Luckett*, 2017 WL 1315669, *3-4 (citations and brackets in original).

### 2)  Applicable Law

The government has a duty to preserve material evidence, i.e., evidence whose exculpatory value was apparent before it was destroyed and that is of such a nature that the defendant cannot obtain comparable evidence by other reasonably available means.  *See California v. Trombetta*, 467 U.S. 479, 489 (1984); *Grisby v. Blodgett*, 130 F.3d 365, 371 (9th Cir. 1997).

Although the good or bad faith of the police is irrelevant to the analysis when the police destroy material exculpatory evidence, the analysis is different if the evidence is only *potentially* useful: there is no due process violation unless there is bad faith conduct by the police in failing to preserve potentially useful evidence.  *Illinois v. Fisher*, 540 U.S. 544, 547-48 (2004); *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).  Potentially useful evidence is "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant."  *Youngblood*, 488 U.S. at 57.  Another configuration of this test is that a constitutional violation will be found if a showing is made that (1) the government acted in bad faith, the presence or absence of which turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed, and (2) that the missing evidence is "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."  *U.S. v. Sivilla*, 714 F.3d 1168, 1172 (9th Cir. 2013) (internal quotation marks omitted).

Negligent failure to preserve potentially useful evidence is not enough to establish bad faith and does not constitute a violation of due process.  *See Grisby*, 130 F.3d at 371.

The government's duty to preserve material evidence is limited to evidence it has gathered. *Trombetta*, 467 U.S. at 488-90.  Although the government does not generally have a duty to collect exculpatory evidence, a bad faith failure to do so may violate due process.  *Miller v.*

United States District Court
Northern District of California

1   *Vasquez*, 868 F.2d 1116, 1119-20 (9th Cir. 1989).  Due process requires law enforcement to gather

2   and collect evidence where the police themselves by their conduct indicate that the evidence could

3   form a basis for exoneration.  *Id.* at 1121.  The holding of *Miller* is based on *Arizona v.*

4   *Youngblood*, 488 U.S. 51 (1988).  *See N. Mariana Islands v. Bowie*, 243 F.3d 1109, 1117 (9th Cir.

5   2001) (prosecutor's failure to further investigate exculpatory letter in his possession violated due

6   process).

7                                     **3)   Analysis**

8        In Claim 4, Petitioner claims the trial court violated his due process rights by admitting

9   DNA evidence and failing to impose an evidentiary sanction on the prosecution for the loss of

10  evidence.  Dkt. No. 1 at 7.  In essence, Petitioner claims the admission of the DNA evidence

11  violated his due process right to a fair trial and his rights under *Trombetta*.  *See* 467 U.S. at 488.

12       As explained above, Petitioner's claim was rejected on appeal, and the state appellate court

13  found no due process violation.  *Luckett*, 2017 WL 1315669, *3-4.  Also, no *Trombetta* violation

14  was found, according to the state appellate court.  First, the state appellate court found the DNA

15  evidence fell "squarely within the rule requiring bad faith before a violation of [Petitioner's] due

16  process rights can be found."  *Id.* at *4.  Furthermore, the state appellate court found no bad faith

17  conduct by the police in failing to preserve the DNA evidence because nothing in the record

18  suggested "that the police knew or even could have suspected at the time the cigarettes were lost

19  or destroyed that testing might have exculpated defendant" and "substantial evidence undoubtedly

20  support[ed] the trial court's finding that the destruction of the evidence was entirely accidental."

21  *Id.*

22       Because the state appellate court's conclusions are reasonable, Petitioner is not entitled to

23  federal habeas relief.   First, the due process claim was reasonably rejected.  Second, the state

24  court's rejection of the *Trombetta* claim was reasonable.  The record does not show that Petitioner

25  was even a suspect when the three cigarette butts were lost in 2001.  Moreover, the state courts

26  could reasonably conclude that any negligent failure to preserve potentially useful evidence does

27  not establish bad faith, and does not constitute a violation of due process.  *See Grisby*, 130 F.3d at

28  371; *see, e.g.*, *Sivilla*, 714 F.3d at 1172 (finding that where exculpatory value of destroyed

evidence was not apparent, government's negligent failure to preserve it did not establish bad faith).

Because there was no violation of *Trombetta*, the state courts did not unreasonably apply clearly established law by refusing to impose an evidentiary sanction on the prosecution, much less by refusing to apply the specific evidentiary sanction of excluding the DNA evidence.

Accordingly, because the state courts' rejection of Claim 4 was reasonable and is entitled to AEDPA deference, this Court DENIES Claim 4.

### 3.      Right to Present a Defense (Claim 5)

Petitioner contends that he was deprived of his right to present a defense when the court refused to allow evidence that the police stopped someone who identified himself as "Cris[10] Luckett" in the vicinity of the restaurant shortly after the crime.  Dkt. No. 1 at 7.  Petitioner raised this issue on direct appeal, and the state appellate court rejected it on the merits.

### a.      State Court Opinion

The state appellate court described the factual background for this claim and rejected it as follows:

> A police report for the incident includes the following comment: "I responded to 28th St. and Summit for a perimeter.    After approx. 2 min. I detained Luckett, Cris (MIB/30APR52—926 E. 17th St. Apt. 1) who was walking E/B on 28th St.  He was wearing a [white shirt] and dirty dark pants.  After several witnesses advised negative on a field lineup I released Luckett."  Before trial, the court granted the prosecution's motion in limine to exclude any mention of a Cris Luckett having been stopped by police.  The trial court found that the evidence was inadmissible to show third-party culpability under *People v. Hall* (1986) 41 Cal. 3d 826 (*Hall*) and not relevant to any other purpose.)
>
> On appeal, defendant contends the police report was sufficient to warrant its admission and a third-party culpability instruction under *Hall*.    Third-party culpability evidence is admissible if it is "capable of raising a reasonable doubt of defendant's guilt.  At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability. . . .  [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt; there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime."  (*Hall*, *supra*, 41 Cal. 3d at p. 833.)  In this case, there is no direct or circumstantial evidence linking Cris Luckett to the commission of the crime.  At most, the report is some evidence that Cris was in the area and thus, had the opportunity to commit the crime.  Accordingly, the court did not err in finding no basis for

---

[10] The record contains different spellings of Petitioner's brother's name, which include "Cris," "Chris," and "Christopher," but the Court will use "Cris," the spelling used by Petitioner in his petition. Dkt. No. 1-1 at 11.

United States District Court
Northern District of California

admission of the report under *Hall*.[FN 4]

> [FN 4]:  The Attorney General argues that because the police report does not establish how the reporting officer determined the man's identity the report is hearsay and cannot be admitted to establish that Cris Luckett was in fact stopped by police that night.  Because the report is insufficient to establish third-party culpability under *Hall,* we need not resolve the hearsay question.

Defendant argues, alternatively, that even if the report was insufficient to show Cris committed the crime, evidence that Cris, or someone who knew him, was in the area that night is relevant because it provided an explanation for how his DNA might have been on the cigarette butt found in the restaurant.  At the preliminary hearing he argued that there was a "logical explanation" for how his DNA ended up on the cigarette in the restaurant; he shared a cigarette with his brother or his brother took the cigarette from him because he no longer smokes.  On appeal he clarifies that the relevance of the evidence is not dependent on proof that it was actually Cris who was stopped that night.  Rather, he suggests the evidence is relevant because "The presence of *anyone* in the area who might visit/drink with appellant (in L.A. or otherwise)—especially his brother or associates/friends—was key to offer a significant innocent explanation for this minute DNA."  In other words, at some unidentified time prior to that night, the cigarette was passed from defendant to either Cris, or someone who knew Cris, who then brought and smoked the cigarette at the restaurant.

We question whether this argument was properly preserved for appeal.  Although argued at the preliminary hearing, no similar argument appears to have been made to the trial judge.  Rather, defendant argued that the evidence was admissible to establish that defendant was not observed at or near the scene despite the perimeter set by the police.  Defense counsel argued, "I have no information that Cris Luckett committed this crime that Mr. Charles Luckett is charged with.  I have no information, but I do know he was in the area.  I do know that other individuals were in the area.  And the relevance of that information bears strongly upon Mr. Luckett, Charles Luckett's innocence, because he was not there.  He was not found.  And I think the value of the evidence is to demonstrate that in a very short time after the crime was committed, officers secured an area and they did obtain . . . eight people altogether."  The court reasonably rejected this argument, explaining that evidence of the identity of the people stopped is not relevant to establish that defendant was not stopped or identified.

We need not resolve this argument on the basis of waiver, however, as defendant's explanation for how his DNA ended up in the restaurant was too speculative to warrant putting before the jury.  (*People v. Morrison* (2004) 34 Cal. 4th 698, 711 ["Evidence is irrelevant . . . if it leads only to speculative inferences."]; *People v. Babbitt* (1988) 45 Cal. 3d 660, 684 [The "exclusion of evidence that produces only speculative inferences is not an abuse of discretion."].)  Likewise, the exclusion of irrelevant evidence does not implicate a defendant's due process right to present a defense. (*Babbitt, supra,* at p. 685 ["[B]ecause defendant's evidence failed to meet the threshold requirement of relevance, its exclusion . . . did not implicate any due process concerns."].)

Here, defendant did not make an offer of proof sufficient to explain with any reasonable certainty how the cigarette may have travelled from Compton to Oakland.  Given the significant evidentiary gaps in the proffered defense and its general lack of plausibility, any error in the exclusion of this evidence was harmless.

Defendant also argues the exclusion of this evidence was prejudicial because it was "key to rebut a troubling eyewitness courtroom identification, if only to show another man (whether Cris, appellant using a false name, according to the prosecutor, or someone else associated with them) was stopped but not identified by several people."  This argument was not raised below.  Again, however, we need not rely on waiver as the argument is without merit.

United States District Court
Northern District of California

Assuming that the man stopped was neither Cris nor defendant but someone "associated" with them, that evidence is completely irrelevant to Smith's in-court identification. Assuming it was defendant who was stopped that night but not identified, that evidence would be relevant to the in-court identification, but it would also be so damaging to defendant's case that it would be impossible to conclude that defendant was prejudiced by its exclusion. Finally, if the man stopped was Cris, the evidence would be relevant and exculpatory only if defendant could establish that he and his brother looked sufficiently alike that one could reasonably be mistaken for the other. Defendant did not attempt to make such a showing; no offer of proof was made in that regard. Accordingly, there was no error in the exclusion of all references to Cris Luckett being stopped by the police the night of the crime.

*Luckett*, 2017 WL 1315669, *6-7 (footnotes in original and brackets added).

### b.      Factual Background

According to a July 17, 1993 police report, shortly after the murder on July 16, 1993, an officer,[11] who according to defense counsel was named Officer John Carroll, 1RT 86, stopped a man at 28th Street and Summit Street in Oakland. Supp. CT 13, 18.[12] The report identifies that man as Cris Luckett, and the report contains a birth date and an identifying number. Supp. CT 13, 18. However, the report does not state how the identity of the man who was stopped was established. Supp. CT 13, 18. The report states that the officer released the man who was stopped after several witnesses were brought to the scene and did not identify him as one of the assailants. Supp. CT 13, 18.

Defense counsel filed a written motion requesting that the court take judicial notice of the court file in a case in which Cris Luckett had entered pleas of guilty to some of 27 counts of robbery with which he was charged from December 1984 through April 1985. 3CT[13] 604.

The prosecutor moved to exclude evidence of the claimed identity of the man who was stopped at 28th and Summit on the basis that it was hearsay and that it was not proper evidence of third-party culpability. 3CT 627-644.

At a hearing on the motion, defense counsel stated that the purpose of the evidence was to

---

[11] The name of the officer is not visible on the copies of the July 17, 1993 police report in the Supplemental Clerk's Transcript. Supp. CT 13, 18.

[12] The July 17, 1993 report appears twice in the record. *See* Supp. CT 13, 18.

[13] Volume 3 of the Clerk's Transcript ("3CT") has been lodged by Respondent as Exhibit A. *See* Dkt. No. 10-7.

show that there was a perimeter set up within minutes after the shooting, that several people matching the description of the suspects were in the perimeter, and that Petitioner was not one of those people.  1RT 87.  Defense counsel then stated: "It's not to show that Chris Luckett committed any crime, either past or present.  It's merely to show the procedures that were in place, the timeline, who was involved, and what they saw and heard."  1RT 88.

The trial court stated that this did not rise to the level of third-party culpability evidence, but that defense counsel could show that other people were stopped in the perimeter and that Petitioner was not one of them.  1RT 88.  It stated:

> So if the officer who stopped Christopher Luckett says well, I stopped Christopher but I didn't stop Charles, that doesn't seem to me to be relevant.  The fact of the matter was Mr. Charles Luckett was not stopped, was not arrested, was not identified, even if the perimeter was set up two seconds after the robbery.
>
> So the way of defining it is you can ask the officers, any of the officers who were present at the scene, whether Mr. Luckett was stopped or not, Mr. Charles Luckett.  But to say that Mr. Christopher Luckett was arrested, not I.D.'d, and others were arrested and not I.D.'d, whatever, doesn't really seem to be relevant because none of it rises to the *Hall* standard.

1RT 88-89.

Defense counsel stated that he wanted to argue that Petitioner was not one of those stopped at the scene.  1RT 90.  The following exchange then took place:

> THE COURT:  That's fine.  I don't have any issues with that.  It's just the inclusion of the other people that were arrested and not identified, including Chris Luckett, is not relevant.  It doesn't r[i]se to the *Hall* standard.
>
> MR. BERRY [defense counsel]:  But it is relevant that they were—that the police stopped them and identified them.
>
> THE COURT:  But nobody said that's one of the guys in the restaurant that committed the robbery.
>
> MR. BERRY:  I don't know what they're going to say.
>
> THE COURT:  Well, the police reports would give us some idea of, you know, we stopped John Smith, he was I.D.'s as being in the restaurant, he was also I.D.'s as being at the table where the two people that committed the robbery were.  We don't have that.  So you can't just bring in everybody every time there's an incident that happened, somebody's stopped and I.D.'s, they're not really arrested, they're stopped and I.D.'s and witnesses come and no, that's not the guy, and they're let go, you can't bring in all those people, it seems to me.
>
> MS. HILTON [the prosecutor]:  Can I just note a couple things?  Just two things.  Number one, Mr. Berry said there was a name, date of birth and PFN.  Well, there's a name and date of birth within the report written over that in different pen, sort of as if the information came in later is the PFN.  So it's not clear that that information came in at the time.

Additionally, in the statement given by Mr. Luckett to Officer Webber, he talks about giving his brother's name, not Chris Luckett, but a John Luckett, and a date of birth other times that he had been arrested.  So it's not out of the province of possibility and actually more likely that it was Charles Luckett that was stopped that day and maybe not identified and therefore let go.

So unless an officer comes in and says—we're still at the first level of hearsay—I got these names and birth date, I then verified it that way, verified it, it doesn't even get past the first level of hearsay.

THE COURT:  Okay.  Mr. Berry, anything further?

MR. BERRY:  Only that I have—until the officer comes and testifies, I don't know what he's going to say what happened that day.

THE COURT:  Well, one of the theories you say is that one of the persons he stopped is Charles Luckett.  Well, he's either there or he ain't there.  In any case, it doesn't raise to the level of the *Hall* standard.  So no mention of Chris Luckett.

1RT 90-91 (brackets added).

### c.      Applicable Federal Law

The U.S. Constitution gives a criminal defendant the right to present a defense.  "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment . . . or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, . . . the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'"  *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citations omitted).  The Due Process Clause does not guarantee the right to introduce all relevant evidence.  *Montana v. Egelhoff*, 518 U.S. 37, 41-42 (1996).  A defendant does not have an unfettered right to offer evidence that is incompetent, privileged or otherwise inadmissible under standard rules of evidence.  *Id.*  In determining whether the exclusion of evidence was constitutionally impermissible, the court balances the importance of the evidence to the criminal defendant against the state's interest in excluding the evidence.  *Miller v. Stagner*, 757 F.2d 988, 994 (9th Cir.), *amended*, 768 F.2d 1090 (9th Cir. 1985).  Even if the exclusion of evidence was a constitutional error, the erroneous exclusion must have had a "substantial and injurious effect" on the verdict for habeas relief to be granted.  *Brecht*, 507 U.S. at 623.

A state court's evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory

1    provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process.

2    *See Pulley*, 465 U.S. at 41; *Jammal v. Van de Kamp*, 926 F.2d 918, 919-20 (9th Cir. 1991).

3    Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for

4    granting federal habeas relief on due process grounds.  *See Henry v. Kernan*, 197 F.3d 1021, 1031

5    (9th Cir. 1999); *Jammal*, 926 F.2d at 919.  While adherence to state evidentiary rules suggests that

6    the trial was conducted in a procedurally fair manner, it is certainly possible to have a fair trial

7    even when state standards are violated.  *Perry v. Rushen*, 713 F.2d 1447, 1453 (9th Cir. 1983).

8         "[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules

9    excluding evidence from criminal trials."  *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006)

10   (internal quotations and citations omitted).  This latitude is limited, however, by a defendant's

11   constitutional rights to due process and to present a defense, rights originating in the Sixth and

12   Fourteenth Amendments.  *See id.* at 324.  "[A]t times a state's rules of evidence cannot be

13   mechanistically applied and must yield in favor of due process and the right to a fair trial."

14   *Lunbery v. Hornbeak*, 605 F.3d 754, 762 (9th Cir. 2010) (finding California's application of its

15   evidentiary rules to exclude hearsay testimony that bore persuasive assurances of trustworthiness

16   and was critical to the defense violated right to present evidence).  Importantly, the exclusion of

17   evidence that another person may have committed the crime violates due process and the Sixth

18   Amendment.  *See Chambers v. Mississippi*, 410 U.S. 284 302-03 (1972); *see also Lunbery*, 605

19   F.3d at 760 (exclusion of critical hearsay testimony pointing to another killer was an unreasonable

20   application of *Chambers*).

21        Only rarely has the Supreme Court held "that the right to present a complete defense was

22   violated by the exclusion of defense evidence under a state rule of evidence."  *Nevada v. Jackson*,

23   569 U.S. 505, 509 (2013).  The Ninth Circuit many times has held that state courts acted

24   reasonably in excluding unreliable or insubstantial evidence of third-party culpability.  *See*

25   *Phillips v. Herndon*, 730 F.3d 773, 776-78 (9th Cir. 2013); *Christian v. Frank*, 595 F.3d 1076,

26   1085-86 (9th Cir. 2010); and *Spivey v. Rocha*, 194 F.3d 971, 978 (9th Cir. 1999).  Under

27   California law, a defendant may present evidence of third-party culpability only if it links the third

28   person to the actual commission of the crime.  *Id.* (citing *People v. Hall*, 41 Cal. 3d 826, 833

1  (1986)).

2  ### d.  Analysis

3      The state appellate court's determination that the proffered third-party evidence was not

4  relevant to the crime at issue was not contrary to, or an unreasonable application of, clearly

5  established federal law.  *See* 28 U.S.C. § 2254(d).  Rather, the state appellate court reasonably

6  concluded that there was no direct or circumstantial evidence linking Cris Luckett to the

7  underlying crime.  The state appellate court found that, at most, the report amounted to "some

8  evidence that Cris was in the area and thus, had the opportunity to commit the crime." *Luckett*,

9  2017 WL 1315669, *6.  Petitioner's suggestion that his brother, Cris, was responsible for the

10  murder is speculative at best.  As the state appellate court found, it tends only to show that Cris

11  Luckett had the opportunity to commit the murder.  Under the circumstances, the decision to

12  exclude the evidence was well within the permissible scope of discretion and did not render

13  Petitioner's trial fundamentally unfair.  *See Spivey v. Rocha*, 194 F.3d 971, 978 (9th Cir. 1999)

14  (finding that the trial court's exclusion of purely speculative evidence as to a third party's possible

15  motive for committing the crime did not render the trial fundamentally unfair).  At a minimum, it

16  cannot be said that the state appellate court's rejection of Petitioner's federal claim was objectively

17  unreasonable.  *See Williams*, 529 U.S. at 409.

18      Even if there was an evidentiary error of constitutional dimension, habeas relief would not

19  be warranted because the error would be harmless under *Brecht*.  *See* 507 U.S. at 623.  The state

20  appellate court found that any error in the exclusion of this evidence was harmless, and further

21  noted that "if the man stopped was Cris, the evidence would be relevant and exculpatory only if

22  [Petitioner] could establish that he and his brother looked sufficiently alike that one could

23  reasonably be mistaken for the other" but "no offer of proof was made in that regard." *Luckett*,

24  2017 WL 1315669, *7.  Moreover, the excluded evidence did not tend to exculpate Petitioner.

25  The evidence did not refute the DNA evidence, the primary evidence that implicated Petitioner.

26  Lastly, even if Cris Luckett had been in the vicinity, that in itself would not mean that Petitioner

27  was not there.

28      In sum, because the third-party culpability evidence was speculative and did not

sufficiently connect Petitioner's brother to the crime, the trial court's exclusion of such evidence was reasonable.  Accordingly, the state appellate court's rejection of this claim was not contrary to or an unreasonable application of clearly established Supreme Court law.  Therefore, Claim 5 is DENIED.

### 4.    Destruction of Evidence (Claim 6)

The Court has already analyzed Claim 6 on the destruction of evidence (i.e., the three cigarette butts) to the extent that he raised a *Brady* violation, but Petitioner purports to raise this claim as an issue in its own right.  Dkt. No. 1-1 at 2, 7.  Thus, out of an abundance of caution, the Court will address it further below.

According to the petition, Claim 6 is based "the loss/destruction of three cigarette butts in police custody [on] June 5, 2012 after [Petitioner is] charged," and in support of his claim he cites to a laboratory contact log, 1CT[14] 9, from June 2012, that referred to one of the investigating officers requesting information from a laboratory employee[15] about the cigarette butts that the police had collected.  *See* Dkt. No. 1-1 at 7-10.  Petitioner attached a copy of that log to his petition and highlights the section under "Notes" from a "Telephone Conversation - Officer H. Webber" on June 5, 2012 at "10:35" (not specified if AM or PM), which includes the following notes from the laboratory employee:

> Officer H. Webber called and informed me that the pg5#1 cigarette butts submitted by T. Camacho were indeed the cigarette butts previously belonging to item pg1#4. Aunt in property was looking for the pg5#1 item.  I said he could submit a request to have the pg5#1 cigarette butts examined and that I would work it in to my next pod rotation.

*Id.* at 10.

Respondent points out that the only remaining constitutional issue Claim 6 appears to present is "the one that he raised in his fourth claim, i.e. that the court should have excluded DNA evidence as a sanction for the destruction of evidence, allegedly in violation of *Trombetta*."  Dkt.

---

[14] Volume 1 of the Clerk's Transcript ("1CT") has been lodged by Respondent as Exhibit A.  *See* Dkt. Nos. 10-3, 10-4.

[15] According to Petitioner's traverse, the laboratory employee's name is "Ms. Iglesias-Lee."  Dkt. No. 12 at 28.

United States District Court
Northern District of California

No. 10-1 at 27.  Respondent further argues as follows:

> Petitioner first raised this issue in the petition for habeas corpus filed in the California Supreme Court, but he raised it as part of his *Trombetta* argument. Answer, Ex. M.  Petitioner did not fairly present the claim as a separate federal issue to the California Supreme Court, and therefore, Petitioner would have exhausted only the *Trombetta* aspect of the claim.  Our response to the *Trombetta* aspect of this claim is the same as our response to the *Trombetta* issue we addressed in connection with Petitioner's fourth claim.

*Id.* at 27-28.  The Court agrees with Respondent that this seems to be the only remaining issue, and further notes that Petitioner cited to *Trombetta* in his argument section pertaining to Claim 6.  *See* Dkt. No. 1-1 at 7.  In its analysis above resolving Claim 4, the Court pointed out that in rejecting Petitioner's *Trombetta* claim, the state courts "did not unreasonably apply clearly established law by refusing to impose an evidentiary sanction on the prosecution, much less by refusing to apply the specific evidentiary sanction of excluding the DNA evidence." *See supra* Part III.B.2.c.(3).  The Court's *Trombetta* claim analysis for Claim 4 applies to Claim 6, and therefore any remaining *Trombetta* claim in Claim 6 is DENIED for the same reason.

Finally, Respondent argues that Petitioner's argument in Claim 6 "rests of a false factual assumption" that the evidence was destroyed in 2012.  Dkt. No. 10-1 at 28.  Respondent elaborates on this argument as follows:

> There is no basis for Petitioner's assumption that the cigarette butts in this case were destroyed in 2012.  The page of the log on which Petitioner relies does not state that the cigarette butts were destroyed in 2012.  Rather, at the hearing of June 17, 2013, the trial court, in ruling on Petitioner's motion to dismiss, stated:
>
>> The cigarette butts, based on the evidence that's been presented in this case, appear, it's not concretely demonstrated, but the evidence suggests that it was some time right about the beginning of 2001 that the cigarette butts were destroyed. Before October of '01, before the delay period that you're complaining about, they had already destroyed, it appears from the testimony, and I'm thinking about the post-it note that's attached—it was attached in October of '01 to the property sheet, saying that it appears that—it's presumed that it's destroyed by a person named Miers, M-i-e-r-s, on January 1st of '01.  So the loss of those butts doesn't appear to be the product of the delay that you're complaining about.
>
> 4RT[16] 92.

---

[16] Volume 4 of the Reporter's Transcript ("4RT") has been lodged by Respondent as Exhibit B. *See* Dkt. No. 10-12.

United States District Court
Northern District of California

1

2

3

> Thus, the state courts found that the butts were destroyed in 2001, not 2012 and Petitioner has not alleged any basis by which this Court, applying the standard for review under the AEDPA, can conclude the contrary.  Accordingly, Petitioner's argument rests on a factual assumption that is at odds with the state court's finding.

*Id.* (footnote added).

4

5

6

7

8

9

Meanwhile, in his traverse, Petitioner stresses that the laboratory employee, whom Petitioner identified as Ms. Iglesias-Lee, made the following statement when describing the conversation with Officer Webber on June 5, 2012: "I said he could submit a request to have the pg5#1 cigarette butts examined and that I would work it in to my next pod rotation."  Dkt. No. 12 at 28.  Thus, Petitioner challenges the finding that the evidence was destroyed in 2001 and argues as follows:

10

11

12

> If Webber did not indeed have the pg5#1 items [i.e., the missing cigarette butts] [on] June 5, 2012, he surely had convinced Iglesias-Lee that he did, for she suggested that she submit a request to have the pg5#1 items examined and she would work it into her rotation.

13

14

15

16

17

18

*Id.*  However, Petitioner fails to provide any supporting facts to show that the evidence was not destroyed in 2001.  Instead, he makes a conclusory argument that his interpretation of the laboratory employee's statement above shows that the evidence was available on June 5, 2012 and must have been destroyed sometime after that date.  *See id.*  "Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief."  *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994).

19

20

21

22

23

Therefore, the Court concludes that the state courts' rejection of Claim 6 was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, 28 U.S.C. § 2254(d)(2), nor was it contrary to, or an unreasonable application of, clearly established federal law, *id.* § 2254(d)(1).  Accordingly, Petitioner is not entitled to relief on Claim 6.

24

### C.    Certificate of Appealability

25

26

27

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability.  *See* Rules Governing § 2254 Case, Rule 11(a).

28

A judge shall grant a certificate of appealability "only if the applicant has made a

United States District Court
Northern District of California

substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard, *id.* § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, Petitioner has not made such a showing, and, accordingly, a certificate of appealability will be denied.

## IV.     CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is DENIED, and a certificate of appealability is DENIED.

The Clerk of the Court shall enter judgment in favor of Respondent and close the file.

**IT IS SO ORDERED.**

Dated:  11/23/2020

HAYWOOD S. GILLIAM, JR.
United States District Judge

United States District Court
Northern District of California

35